IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:10-cr-03404-RB |
| GLORIA PORTER, | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

THIS MATTER comes before the Court on Defendant's Motion to Suppress Physical Evidence and Memorandum in Support Thereof. (Doc. 20.) An evidentiary hearing was held before this Court on May 11, 2011. Having carefully considered the parties' arguments and otherwise being fully informed, the Court makes the following findings of fact and conclusions of law, and enters an order DENYING Defendant's Motion to Suppress.

**FINDINGS OF FACT**

1.  Defendant Gloria Porter worked as a civilian at the White Sands Missile Range (WSMR) beginning in September 1990. Defendant served as a customer service clerk for the Department of Public Works at WSMR, which was responsible for the maintenance and repair of structures and the infrastructure at WSMR. Defendant was assigned a cubicle in building 174A at WSMR where she worked for eighteen years until she went on workers comp on September 9, 2009.

2.  Defendant lived in Chaparral, New Mexico and entered WSMR each day through the

    southern, El Paso gate, where there is a sign prominently stating the following:

> All persons desiring entry upon this installation are advised that as a condition on entry, they, their possessions and their vehicles are subject to search upon entry, while within the confines of the installation or upon departure. Entry upon this installation is considered to be automatic consent to search of person, possessions and vehicle.

    (Gov't Exs. 4 & 5.)

3. From 1996 through 2008, Defendant served as President of the International Association of Machinists Local Union 2049 (Local 2049). From 2000 through 2008, Defendant also served as the Secretary-Treasurer of the Army Command Council (AMC Council). These labor organizations represented local federal employees; however, they were affiliated with and received funds from the National Federation of Federal Employees (NFFE) and the International Association of Machinists (IAM). (Gov't Ex. 1.)

4. As Secretary-Treasurer of AMC, Defendant was responsible for maintaining a bank account for the AMC and overseeing union funds going in and out of the organization's account.

5. Although there was a Union Hall located on WSMR with office and meeting space for union activities, the great majority of the time, Defendant would meet with union officers and members to conduct union business at her cubicle in Building 174A, or just outside at the picnic area. Defendant also stored union files in her work area.

6. As the Local 2049 and AMC were affiliated with and received funds from the large, national and international labor organizations NFFE and IAM, the local unions were required to follow the IAM Constitution and were subject to regular audits of their union funds.

7. The IAM Constitution, which the local unions were required to follow, specifically states that auditors may demand financial records from local lodges:

> Upon demand therefore by the G.S.T., the officers of any L.L., D.L., council or conference shall forthwith surrender and turn over to the G.S.T. or to an auditor whom he/she may designate, all books, vouchers, bills, receipts and records of such L.L., D.L., council or conference.

(Gov't Ex. 3.)

8. On September 19, 2008, Witherspoon, who was a member of the AMC Council Auditing Committee, reported to William Dougan, Secretary-Treasurer of NFFE, that while reviewing the Council's financial records, the committee had encountered a number of potential concerns. One concern was that Defendant had failed to provide a full set of bank statements. Additionally, the bank statements that Defendant did provide did not appear proper—for instance, there were numerous typographical errors.

9. After reviewing the records provided by Witherspoon, Mr. Dougan agreed that the bank statements appeared fraudulent. Mr. Dougan then contacted the Wells Fargo bank to attempt to breach the account—by changing signatories on the account from Defendant to himself—and thus gain access to the actual account records.

10. Once Mr. Dougan gained access to the bank accounts, he discovered a number of purchases and ATM withdrawals that were not listed on the bank statements provided by Defendant to the AMC Council Auditing Committee. The purchases appeared to be of a personal nature. Additionally, the purchases were made with an ATM card. Under the IAM Constitution, local unions were not allowed to use ATM cards to make purchases.

11. After discovering the suspect purchases, Mr. Dougan contacted NFFE President Rick Brown, who brought in an independent auditor to look at the AMC Council audit records. The independent audit report indicated a considerable amount of union funds were missing from the AMC Council's account.

12. NFFE President Brown then contacted IAM President Muhulsky, and on October 14, 2008, IAM Grand Lodge Auditor William Dameron was tasked with performing an audit of the AMC Council account.

13. On October 22, 2008, Mr. Dameron sent a letter to Defendant requesting that she provide him with receipts, ledgers, books, checks, and any other documentation supporting legitimate union expenses to assist in his audit of the AMC Council. Mr. Dameron requested that Defendant provide the information within fifteen days. Defendant signed for the letter from Mr. Dameron on October 27, 2011.

14. In mid-October 2008, Linda Seeley, the Special Assistant to the IAM President, was training to become an IAM auditor. Ms. Seeley normally worked in Dallas, Texas, but at the time, she happened to be in Albuquerque, New Mexico, visiting some of the local lodges that she serviced. As she was already in New Mexico, Mr. Dameron, who was stationed in Washington D.C., requested that Ms. Seeley visit WSMR to retrieve the requested union records from Defendant to assist in his audit. Defendant had not responded to the letter that Mr. Dameron sent on October 22, 2008.

15. At approximately 12:00 p.m. on October 29, 2008, Ms. Seeley met Antonio Cataldi—a union steward and member of the executive board for the Local 2049—at the northern, Las Cruces gate to WSMR. Ms. Seeley was required to provide a driver's license as identification in order to enter the base, but she was driven onto the base by Mr. Cataldi.

16. Although Mr. Cataldi at times served as a law enforcement officer for WSMR with the authority to carry a weapon and badge, to issue citations, and to perform searches and seizures of civilians on the base, on October 29, 2008, Mr. Cataldi was on administrative leave and had no law enforcement authority.

17. Mr. Cataldi first drove Ms. Seeley to the WSMR Union Hall; however, they were unable to find any of the records that Mr. Dameron had requested. The only item seized from Union Hall was a lock box they thought might contain union documents.

18. Next, Mr. Cataldi drove Ms. Seeley to Defendant's office building. As Defendant regularly conducted union business in her workspace, Mr. Cataldi thought it likely the missing union documents could be found there. Mr. Cataldi stated that he and other union officers conducted 99% of their union business with Ms. Porter either at her workstation or outside in the picnic area.

19. On direct examination, Defendant stated the following when asked about the use of her workspace for union business and access to her office by other union members and officers.

> Q. Okay. Now, we've heard testimony that people who had union problems would go and visit you there at your building, correct?
> A. Yes.
> Q. Now, could, to your knowledge or to your understanding, any—if you were not there, could somebody just come and go into your desk and remove union documents?
> A. Could they? I suppose they could. They never did. They would wait for me to come back and ask me for whatever they needed.

(Tr. 153–54.)

20. Upon entering the building, Mr. Cataldi stopped to talk to Defendant's supervisor, José Garcia, and to find out if Defendant was present in the office that day. Mr. Garcia indicated that Defendant had taken the day off. Mr. Cataldi then informed Mr. Garcia that he was a union officer and asked for permission to remove union documents from Defendant's workspace. Mr. Garcia knew that Defendant regularly conducted union business at her workspace, and he assumed that Mr. Cataldi had permission to take the documents; therefore, Mr. Garcia indicated that they were free to go to Defendant's workspace and take

      the union documents they were looking for.

21. Mr. Cataldi, as a union representative and federal employee at WSMR, performed the search of Defendant's cubicle. Mr. Cataldi reviewed the documents he seized from Defendant's workspace to determine that they belonged to the union and were not of a personal nature, confidential, or property of the U.S. Army. He then handed the documents to Ms. Seeley. Mr. Dameron had specifically instructed Ms. Seeley to retrieve, among other things, Wells Fargo bank statements for the time period covered by the audit. Accordingly, Mr. Cataldi focused primarily on finding and seizing the Wells Fargo bank statements and did his best to limit his search to those documents that appeared, on their face, to be union property. The entire search took approximately thirty minutes.

22. When Defendant returned to work, she noticed that there were documents missing from her workstation. She contacted Detective James Dennet, a civilian detective employed at WSMR. Defendant informed Detective Dennet that someone had taken union documents from her workspace. Defendant did not indicate that any personal property had been taken.

23. Defendant officially retired from WSMR in Summer 2010 for medical reasons. Defendant had been on workers comp since September 2009. During 2009–2010, however, Defendant never came back to the office to clean out her cubicle or remove any personal items. In Spring 2011, Defendant's supervisor, José Garcia, contacted Defendant on two occasions to inform her that they were going to be packing up her items and asking if she would like to be present. Defendant declined.

24. On April 7, 2011, in preparation for the evidentiary hearing in this matter, Assistant United States Attorney Stephen Wong and FBI Special Agent Anthony Armijo went to Defendant's workstation in Building 174A on WSMR to photograph the cubicle. It came to their

attention that the computer Defendant used while working at WSMR was still in the cubicle. There was also a computer hard drive on top of the desk.

25. Agent Armijo returned to WSMR on April 18, 2011 and seized the computer and hard drive. The computer and hard drive were turned over to Officer Mike Brookerson of the Las Cruces Police Department for analysis. An analysis of the small hard drive indicated that it was registered to WSMR, and that the primary user was Gloria Porter. The analysis also revealed Wells Fargo bank statements that had been created as word documents.

26. At the evidentiary hearing in this matter, Defendant disclaimed any ownership of or right to access files on the computer or hard drive. Defendant indicated that she did not know where the hard drive found on top of the desk came from; and with respect to the computer, since she medically retired in Summer 2010, Defendant indicated that it no longer belonged to her.

## **CONCLUSIONS OF LAW**

1. "The Fourth Amendment protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995). The Fourth Amendment therefore proscribes only government, not private, action. *United States v. Jacobson*, 466 U.S. 109, 113 (1984).

2. The United States does not dispute that the seizure of documents from Defendant's cubicle constituted government action, as the seizure was conducted as part of an audit to comply with financial disclosure laws for labor unions. *See* 29 U.S.C. §§ 401–41; 29 C.F.R. §§ 401–59; *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 610–13 (1989) (concluding that railroads conducting drug tests on employees pursuant to government regulations authorizing breath, urine, or blood tests to detect drugs or alcohol "constituted sufficient Government action to implicate the Fourth Amendment"). Therefore, the Court

concludes that the seizure of documents on October 29, 2008 constituted government action.

3. "To establish a Fourth Amendment violation, the defendant must prove 'a legitimate expectation of privacy' in the place searched or the item seized." *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Determining whether Defendant had a legitimate expectation of privacy in her workspace at WSMR requires a two-part inquiry: (1) Defendant must have manifested a subjective expectation of privacy in the workspace, and (2) society must recognize the claimed expectation of privacy as objectively reasonable. Accordingly, the Court's inquiry involves both a subjective and objective analysis. In the end, however, "[t]he 'ultimate question' is whether one's claim to privacy from the government intrusion is reasonable in light of all the surrounding circumstances." *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998). This is an objective inquiry, and therefore, regardless of Defendant's protestations that she subjectively believed her workstation was not subject to search, there can be no Fourth Amendment violation without the Court concluding that this belief was objectively reasonable. *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.").

4. "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy [in her workspace] must be addressed on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987). The extent of one's expectation of privacy therefore depends greatly on the access that an employer, colleagues, or members of the public have to the workspace: "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *Id*.

5. While "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the

government instead of a private employer . . . [,] [p]ublic employees' expectations of privacy in their offices, desks, and file cabinets . . . , may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor*, 480 U.S. at 717.  In the case at hand, Defendant's assertion that she possessed a legitimate expectation of privacy in her workspace is contradicted by two important factors: (1) Defendant worked on a closed military base, and (2) Defendant regularly conducted union business in her workspace and allowed other union members into the workspace to conduct union business.

6. Several circuits have applied an "implied consent" exception to conclude that the normal expectations of privacy citizens possess are significantly limited on military installations. *Morgan v. United States*, 323 F.3d 776, 781–82 (9th Cir. 2003); *United States v. Jenkins*, 986 F.2d 76, 79 (4th Cir. 1993); *United States v. Ellis*, 547 F.2d 863, 866 (5th Cir. 1977). On her way to work each day, Defendant passed by a sign that read: "Entry upon this installation is considered to be automatic consent to search of person, possessions and vehicle." (Gov't Ex. 5.)  This sign must have served to puncture any expectation of privacy that Defendant believed she may have held in her person, vehicle, possessions, or workspace as against the WSMR base officials, base law enforcement, or her supervisors.  Accordingly, the Court concludes that by entering the missile range, Defendant impliedly consented to a search by WSMR authorities of any possessions she kept at her workspace.

7. The search in the case at hand, however, was not carried out by WSMR authorities.  Nor was the search carried out by Defendant's supervisor, José Garcia.  While Mr. Garcia consented to the search, he did so under the belief that Mr. Cataldi had permission to take the documents.  Accordingly, the Court concludes that the implied consent exception for searches carried out by base authorities on military installations does not apply in the case

at hand because neither Mr. Cataldi or Ms. Seeley held any law enforcement authority at WSMR, nor were they acting on behalf of base authorities. *See Morgan*, 323 F.3d at 782 ("probable cause requirement is only obviated if the defendant impliedly consented to the search"); *Jenkins*, 986 F.2d at 79 (concluding that "Andrews Air Force Base *police* did not need probable cause or particularized suspicion that [defendant] committed a crime" (emphasis added)); *Ellis*, 547 F.2d at 866 (concluding that by driving onto the Naval Air Station, the defendant gave the "governing authorities of the base" consent to search his vehicle at anytime it was on the premises). Nevertheless, the fact that Defendant worked on a closed military base may help inform the Court's decision as to whether her claimed expectation of privacy was reasonable.

8. As previously stated, an employee's expectation of privacy in her workspace "may be reduced by virtue of actual office practices and procedures." *O'Connor*, 480 U.S. at 717. Defendant treated her workspace like a union office, regularly conducting union meetings and union business in her cubicle or at the office's picnic area. Defendant indicated that union members and officers had access to her building and the workspace; Mr. Cataldi stated that he and other union officers regularly met with Defendant and conducted union business in the workspace; and Defendant's supervisor, José Garcia, indicated that Ms. Porter regularly conducted union business in her cubicle, and that union members would come to her office to settle union business. Notably, Mr. Garcia did not find it unusual that Mr. Cataldi and Ms. Seeley came to the office seeking union documents and assumed that they had permission to do so. Defendant does not challenge the search of the WSMR union hall for the missing documents, nor does she contest that the IAM constitution required her to turn over union financial records for purposes of the audit. Thus, having considered the

        actual practices and procedures followed by Defendant and the union officers and members in their conduct of union business on WSMR, the Court concludes that Defendant gave up any legitimate expectation of privacy she may have held in her workspace as against her union superiors by turning her cubicle into a union office.

9. Furthermore, even if the Court were to conclude that Defendant possessed a legitimate expectation of privacy in her workspace, like searches of students on school premises, a search of an employee's workspace for evidence of work-related misconduct does not require a warrant. *Narotzsky v. Natrona Cty. Memorial Hospital Bd. of Trustees*, 610 F.3d 558, 567 (10th Cir. 2010). The Supreme Court held in *O'Connor* "that public employers' intrusions on the constitutionally protected privacy interest of government employees for . . . investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id*. (citing *O'Connor*, 480 U.S. at 725–26). Thus, provided a search is justified at its inception and reasonable in scope, employers are not required to obtain a search warrant for an employee's workstation because "requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome." *O'Connor*, 480 U.S. at 722.

10. Admittedly, the context is slightly different in the case at hand because Defendant was not in an employer-employee relationship with her union superiors; however, the Court concludes that the reasoning is as applicable here, as it would be in any other hierarchical corporate environment. It would not seem contradictory that in the situation of an investigation into financial impropriety in a corporation, the corporate president would have the authority to pull a file from the vice president's office without a warrant where he or she

11

reasonably believed the file contained evidence of criminal wrongdoing. As Defendant regularly used her WSMR workstation to conduct union business, it served as a union office; and therefore, a search of her cubicle by union superiors did not require a warrant, provided it was justified at its inception and reasonable in scope. *Id.* at 726.

11. "Ordinarily, a search of an employee's office by a supervisor will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct . . . ." *Id.* In the case at hand, Mr. Dameron had substantial evidence in the form of the Wells Fargo bank statements that Defendant had been inappropriately using union funds for personal expenditures. Mr. Dameron reasonably concluded that there would be additional evidence of these or other unlawful transactions at Defendant's union office on WSMR; therefore, he instructed Ms. Seeley to travel to WSMR in his stead to seize union documents. Consequently, the Court concludes that the search was justified at its inception.

12. A search of an employee's office by her supervisor will be reasonable in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct]." *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985)). In the case at hand, Defendant's union superiors contacted a local union officer, Mr. Cataldi, to assist in their search of the union offices on WSMR. Ms. Seeley permitted Mr. Cataldi to conduct the search, as he was more familiar with the office, the location of the union files, and the presence of any potentially sensitive government documents that did not belong to the union. Mr. Cataldi was careful not to seize any personal documents or documents belonging to the government. The search lasted only half an hour, and it was focused only on those union documents relevant to the audit. As the

union supervisors took appropriate steps to ensure they seized only union documents and to minimize the potential intrusiveness of the search, the Court concludes that it "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Therefore, because the warrantless search of Defendant's workstation was both justified at its inception and reasonable in scope, the Court concludes that it did not violate the Fourth Amendment.

13. Additionally, the Court concludes that the seizure of Defendant's computer and hard drive on April 18, 2011 did not violate the Fourth Amendment. "[T]he Fourth Amendment allows for [a] warrantless search and seizure of abandoned property. . . . The test for abandonment is whether the defendant retained a reasonable expectation of privacy in the property." *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002). Any expectation of privacy Defendant may have had in the computer or hard drive disappeared when she retired, and she abandoned the computer and other personal items stored at her WSMR workspace. Indeed, at the evidentiary hearing, Defendant disclaimed any ownership of, or right to the information stored on, either the hard drive or desktop computer, stating that the computer and hard drive did not belong to her at the time of their seizure by FBI Agent Armijo.

14. To summarize, the Court makes the following conclusions of law: (1) Defendant did not have a legitimate expectation of privacy in her workspace at WSMR Building 174A as against her union superiors; (2) even if Defendant did have a legitimate expectation of privacy in her workspace, the warrantless search did not violate the Fourth Amendment because it was reasonable under the circumstances; and (3) the seizure of the computer and hard drive on April 18, 2011 did not constitute a Fourth Amendment violation because Defendant disavowed ownership of both and had abandoned the cubicle and any personal

items stored therein when she retired in Summer 2010.

## ORDER

**WHEREFORE**, the Court hereby **DENIES** Defendant's Motion to Suppress Physical Evidence. (Doc. 20.)

_____
**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**